IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 20, 2017

## STATE OF TENNESSEE v. RYAN MICHAEL RAMEY

**Appeal from the Criminal Court for Unicoi County**
**No. 6754     Lisa N. Rice, Judge**

_____

### No. E2017-00580-CCA-R3-CD

_____

The Defendant, Ryan Michael Ramey, was convicted by a jury of rape, a Class B felony; and theft of $500 or less, a Class A misdemeanor. See Tenn. Code Ann. §§ 39-13-503, -14-103, -14-105 (2015). The trial court imposed a total effective sentence of fifteen years. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions and (2) that the trial court erred in admitting the victim's "single photo identification" and in-court identification of the Defendant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

R. Mitchell Manuel, Erwin, Tennessee, for the appellant, Ryan Michael Ramey.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Anthony Wade Clark, District Attorney General; and Ryan Spencer Curtis, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL BACKGROUND

The victim, K.T.,[1] testified that on November 2, 2015, she fell asleep watching television in bed around 9:00 p.m. K.T. testified that at some point that night, she woke up to a man standing at the foot of her bed. K.T. recalled that the man was wearing a

_____

[1] It is the policy of this court to refer to victims of rape by their initials.

dark hooded sweatshirt and a baseball cap with the hood of the sweatshirt pulled up over the cap.

The man asked K.T., "Where the f--k is Earl at?" When K.T. told the man that she did not know who Earl was, the man responded, "B---h, don't lie to me, I know you know where Earl's at." K.T. testified that the man said that he "was just in this house a couple days ago" and that Earl owed him "money for dope."

K.T. testified that when she picked up her cell phone to call 911, the man "jumped across the bed [and] grabbed [her] by the throat." According to K.T., she and the man then "wrestled around" until they fell off the bed. K.T. further testified that during the attack, she "scream[ed] at the top of [her] lungs, hoping [that] the neighbors would hear [her]."

Once they were on the floor, the man pulled up K.T.'s shirt "and was rubbing on [her] chest." K.T. testified that she begged the man to stop and not to rape her. According to K.T., the man responded by saying, "B---h, quit looking at me," and put "a cloth" over her face. K.T. testified that the man then "pulled down [her] underwear and started rubbing" her vagina. She further testified that she was crying and begging the man to stop as he "stuck his fingers inside of [her]."

K.T. testified that when the man stopped touching her, he asked her if she had any money. K.T. responded that she had some cash in her wallet. According to her, the man took about sixty dollars out of her wallet. The man then told her not to call the police or he would come back and kill her and her children.

K.T. testified that she lay down on floor for a while after the man left. K.T. then went to check on her teenage son who had been sleeping in the bedroom down the hall from her bedroom. After seeing that her son was still asleep, K.T. went to a nearby relative's house because she lost her cell phone during the struggle with the man. K.T. told her relative to get her gun, and they went back to K.T.'s house. K.T. woke her son up and had him go to a neighbor's house. Her relative then called 911 and reported the incident.

K.T. identified the Defendant as the man who attacked her on November 2, 2015. K.T. testified that she did not know the Defendant and that she had not seen him before that night. K.T. further testified that she had no doubt that the Defendant was the man who attacked her. K.T. explained that her television and a lamp were on during the attack and that she saw the man's face. K.T. told the jury that she would "never forget [his face] for the rest of [her] life."

K.T. testified that a few weeks after the rape, her boyfriend told her that the police had been called to a neighbor's house because "some guy had been across the street and that he had the same old story," that he was looking for Earl. K.T. recalled that she talked to her neighbor the next day and decided to go to the police station to see why "the cops let [the guy] go."

K.T. testified that when she got to the police station, she spoke to Erwin Police Department (EPD) Chief Regan Tilson. K.T. then described her interaction with Chief Tilson as follows:

> [Chief Tilson] said that . . . he was trying to figure out how to identify somebody in a lineup or pictures . . . . And he turned around and walk[ed] up to this table and pick[ed] up some pictures. [The Defendant's] picture was on top, and before [Chief Tilson] said anything, I said, "That's him."

K.T. testified that she identified the Defendant before Chief Tilson could even "fan [the pictures] out."

K.T. testified that she kept her doors unlocked and that her backdoor had a broken door handle. She suspected that the Defendant just walked into her house on November 2, 2015. K.T. further testified that her son was "a very deep sleeper" and that she was not surprised that the sounds of her being attacked by the Defendant and screaming did not wake him up. K.T. admitted that she had no injuries or pain caused by the attack. K.T. also admitted that it was possible she went to the police station because she heard that a suspect had been arrested.

Detective Tony Buchanan testified that he was the detective for the EPD and that he began investigating this case the morning after when he was informed about the rape. Detective Buchanan recalled that K.T. thought her attacker "was probably on foot" because she had not heard a car. So Detective Buchanan decided to drive around K.T.'s neighborhood. Detective Buchanan testified that he saw the Defendant walking in K.T.'s neighborhood wearing a maroon hooded sweatshirt and a baseball cap. Detective Buchanan explained that he did not stop the Defendant because he was under the impression that the suspect was wearing a black or blue hooded sweatshirt, even though the suspect had been reported on the 911 call as wearing a brown or maroon one.

On November 16, 2015, there was a 911 call reporting that a man was "banging" on the door of the house "directly across" the street from K.T.'s house and "looking for Earl." EPD Officer Chad McKinney stopped the Defendant while he was walking down a neighboring street. Officer McKinney testified that the Defendant "seemed a little nervous" and said that "he was looking for his friend, Earl." Officer McKinney let the Defendant go because there were no warrants out for his arrest.

The next day, November 17, 2015, Detective Buchanan saw the Defendant and asked him who he had been looking for the previous night. Detective Buchanan testified that the Defendant said he was "looking for [his] friend, Earl." Based upon this, Detective Buchanan and Chief Tilson decided to show K.T. a photographic lineup. Detective Buchanan testified that he went to pick up K.T., but when he got to her house, he was told that she had already gone to the police station.

Chief Tilson testified that he was in the process of printing off photographs for a lineup when there was a knock on the police station door. Chief Tilson further testified that he answered the door holding a photograph of the Defendant without realizing that K.T. was the victim in this case until she asked to see Detective Buchanan. According to Chief Tilson, K.T. saw the Defendant's picture and said, "Is that him? That's him." Chief Tilson responded, "Is it?" Chief Tilson testified that K.T. responded, "Yes." Chief Tilson further testified that he thought K.T. "seemed certain" when she identified the Defendant. Chief Tilson did not recall telling the victim that there was a suspect in her case.

Detective Buchanan testified that, after the Defendant's arrest, the Defendant stated that he had been staying at a house a few blocks from K.T.'s home. Detective Buchanan admitted that there were no physical signs of an altercation in K.T.'s bedroom when he was there on November 3, 2015. Detective Buchanan further admitted that K.T.'s money was not found on the Defendant when he was arrested. There were also no visible injuries on the Defendant.

Miguel Cervantes testified that the Defendant "stayed" with him frequently during the autumn of 2015. Specifically, Mr. Cervantes testified that the Defendant slept at his house on November 2, 2015. Mr. Cervantes testified that the Defendant was in the house when he went to bed around 10:00 or 11:00 p.m. and that the Defendant was there when he woke up between 4:30 and 5:00 a.m.

Mr. Cervantes testified that it was possible that the Defendant left after he went to sleep, "but it would have been very hard." Mr. Cervantes explained that the Defendant slept in the living room and that it was "a little thin house." However, Mr. Cervantes admitted that outside of knowing that the Defendant was there on November 2, 2015, he was "a little shady" on the details of when or how long the Defendant stayed with him.

The Defendant denied raping K.T. The Defendant testified that he had never been in K.T.'s house or knocked on her door. The Defendant further testified that he had never met K.T. According to the Defendant, he came to Mr. Cervantes's house from work, had a few beers, and went to bed around 10:00 or 11:00 p.m. on November 2, 2015. The Defendant further claimed that he only went outside to smoke that night.

The Defendant admitted that Mr. Cervantes's house was about two blocks from K.T.'s house. The Defendant claimed that on November 16, 2015, he decided to look for Earl while Mr. Cervantes was asleep. So the Defendant left Mr. Cervantes's house and knocked on the door of the first house he saw with its lights on. The Defendant explained that he had been released from jail in September 2015 and that he had met Earl while he was incarcerated. The Defendant claimed that he did not know Earl's address or phone number, but that he knew Earl lived in K.T.'s neighborhood. The Defendant further explained that he wanted to find Earl because he thought Earl might know about some possible job opportunities.

The Defendant testified that he was "shocked" when he was accused of raping K.T. The Defendant admitted that he "occasionally" used marijuana and that he had prior convictions for burglary, theft, and vandalism. The Defendant denied that he had ever been charged with assault or any other violent crimes.

Based upon the foregoing, the jury convicted the Defendant as charged of rape and theft of $500 or less. Following a sentencing hearing, the trial court imposed a total effective sentence of fifteen years. This timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. The Defendant argues that there was "no physical, medical, or scientific evidence" establishing the offenses or his identity as the perpetrator. The Defendant further argues that K.T.'s testimony was not credible. The State responds that the evidence was sufficient to support the Defendant's convictions.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The identity of the perpetrator "is an essential element of any crime." State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006). However, "[t]he credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made." State v. Radley, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999). "It is well-established that the identification of a defendant as the person who committed the offense for which he is on trial is a question of fact for the determination of the jury upon consideration of competent proof." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993).

As pertinent for our review, rape is the "unlawful sexual penetration of a victim by the defendant" when either force or coercion used or "[t]he sexual penetration is accomplished without the consent of the victim and the defendant knows . . . that the victim did not consent." Tenn. Code Ann. § 39-13-503(a). "Sexual penetration" includes any intrusion, "however slight, of any part of a person's body . . . into the genital or anal openings of the victim's . . . body." Tenn. Code Ann. § 39-13-501(6).

Theft occurs when a person, "with intent to deprive the owner of property, . . . knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a).

Here, K.T. testified that she awoke to find the Defendant standing at the foot of her bed. After demanding that she tell him where Earl was, the Defendant attacked K.T. when she reached for her cell phone to call 911. The Defendant then fondled K.T.'s chest and stuck his finger inside her vagina while she cried and begged for him to stop.

When he finished, the Defendant took approximately sixty dollars from K.T.'s wallet. This testimony was sufficient to establish the elements of rape and theft of $500 or less.

With respect to the identification of the Defendant as the perpetrator, K.T. testified that the television and a lamp were on during the attack and that she was able to see the Defendant's face. Additionally, K.T. testified that she was certain that the Defendant was the man who attacked her and that she would "never forget" his face. Furthermore, Detective Buchanan testified that he saw the Defendant the next morning walking in the victim's neighborhood and wearing a maroon hooded sweatshirt and a baseball cap, which matched the description of the suspect provided on the 911 call. Additionally, the Defendant admitted that, a few weeks after the rape, he had knocked on the door of one of K.T.'s neighbors looking for Earl. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions.

## II. Identification

The Defendant contends that the trial court erred in admitting K.T.'s "single photo identification" and in-court identification. The Defendant argues that the pretrial identification "was conducted in such an impermissibly suggestive manner [that it] create[d] a substantial likelihood of irreparable misidentification." The State responds that the Defendant has waived this issue by failing to file a pretrial motion to suppress or to make a contemporaneous objection to the identification and that plain error review is not warranted.

The Defendant raised the issue of K.T.'s identification of him for the first time in his motion for new trial. The Defendant made no pretrial motion to suppress the identification nor did he object to K.T.'s identification during the trial. As such, the Defendant has waived full appellate review of this issue. See Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). As such, we address this issue solely to determine if plain error review is appropriate.

The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, the Defendant has failed to show that he did not waive this issue for tactical reasons. Page, 184 S.W.3d at 230. Defense counsel cross-examined K.T. and Chief Tilson extensively about K.T.'s identification of the Defendant at the police station in an attempt to attack K.T.'s credibility. Likewise, defense counsel argued in both his opening and closing statements that the exchange between Chief Tilson and K.T. made any identification of the Defendant suspect. All of this is consistent with a tactical decision to waive the issue in order to attack K.T.'s credibility. Accordingly, we conclude that plain error review of this issue is not warranted.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-8-